# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN THE MATTER OF THE REAL ESTATE OF:

CTC EAST, LLC, A DELAWARE LIMITED LIABILITY COMPANY,

        Petitioner,

        v.

STEVEN GOLDSTEIN and BARRY N. LIPSY, Personal Representative of the Estate of Karen Lipsy and Trustee of The Karen G. Lipsy Revocable Trust, U/A/D November 11, 2019,

        Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2019-0916-SEM

## <u>MASTER'S FINAL POST-TRIAL REPORT</u>

Final Report: September 30, 2022
Date Submitted: June 16, 2022

Phillip A. Giordano, Charles P. O'Brien, and Madeline Silverman, GORDON FOURNARIS & MAMARELLA, P.A., Wilmington, Delaware; *Counsel for Petitioner.*

Charles J. Brown, GELLERT SCALI BUSENKELL & BROWN, LLC, Wilmington, Delaware; *Counsel for Respondent Steven Goldstein.*

Scott G. Wilcox, MOORE & RUTT, P.A., Wilmington, Delaware; *Counsel for Respondent Barry N. Lipsy.*

**MOLINA, M.**

Wedged between the Christiana Town Center and the Christiana Mall, sits an undeveloped parcel of commercial property. Owned by the late Jacob Goldstein, the parcel was passed down to his family, who held it as a potentially lucrative investment. Three have recently "cashed in" on their investment by selling their interests to the owner and developer of adjoining land. Through this action that developer seeks to partition the property to break its co-ownership with the remaining co-owners. The developer advocates for partition in-kind, a physical division of the land into a 60/40 split. One co-owner has no objection; the other argues that division in kind would be determinantal to the co-owners' interests and requests partition by sale. After a two-day trial, for the reasons provided herein, I find the property should be partitioned in kind.

## I. BACKGROUND[1]

The contested property is an undeveloped 3.65-acre tract of land located at 701 W. Main Street, Newark, Delaware (the "Property").[2] The Property, currently,

---

[1] The facts in this report reflect my findings based on the record developed at trial on March 1 and March 2, 2022. *See* Docket Items ("D.I.") 55-56. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcripts are in the form "Tr. #." D.I. 55-56. The parties' jointly submitted exhibits are cited as "JX--" As explained at the conclusion of trial JX1-7 and 12-15 were admitted, JX10-11 were admitted only for the limited purposes used at trial, and JX8-9 were not admitted. Tr. 228:11-16.

[2] D.I. 50, III. ¶ 7.

"is a flat vacant piece of land covered with weeds and high grass."[3] But it was not always that way. Initially "[t]here was woodland and ravines in it, and it could only be accessed through little roads from adjoining residential neighborhoods."[4] But "[s]tarting in the late 1990s, Frank Acierno, . . . cleared all the land. He filled it in with fill and increased the level of the land about 5 feet and closed off the access . . . through the adjacent residential neighborhood."[5] Mr. Acierno also "asked the County to rezone" the Property to commercial.[6] But even with the rezoning, the Property contains some areas that are not developable. These areas include a riparian buffer, with prohibitive slopes and precautionary slopes.[7]

---

[3] Tr. 34:18-21. *See also* Tr. 7:18-20 ("It's just a field.").

[4] Tr. 35:22-36:2.

[5] Tr. 37:1-6. *See also Acierno v. Goldstein*, 2004 WL 1488673, at *6 (Del. Ch. June 25, 2004) (quoting Mr. Acierno's statements regarding clearing the Property). The Delaware Uniform Rules of Evidence allow the Court to take judicial notice of "the records of the court in which the action is pending and of any other court of this State or federal court sitting in or for this State." D.R.E. 202(d)(1)(C).

[6] Tr. 37:11-13. *See also* Tr. 24:22-24, Tr. 95:17-19.

[7] Tr. 88:8-17. *See also* Tr. 202:12-203:1. As explained by expert witness Dev Sitaram, a riparian buffer "is a buffer next to a floodplain and wetlands." Tr. 88:10-12. Mr. Sitaram further explained that prohibitive and precautionary slopes are regulated by New Castle County, with prohibitive slopes "100 percent not developable[,]" but "precautionary slopes have some development potential, meaning some of the precautionary could be disturbed." Tr. 88:12-17.

As depicted below in Figure A, the Property sits in the middle of a heavily developed area which boasts the Christiana Mall, the Christiana Town Center, and Christiana Fashion Center.[8]



*Figure A, JX4, p.17 (emphasis added).*

In Figure A, the Property is the area highlighted in yellow. Directly above the Property is another undeveloped parcel, which is owned by CTC East, LLC

---

[8] *See* Tr. 10:18-11:1. As further explained by expert witness John J. Coyle, the Property "is contained within the larger Christiana Town Center. The Christiana Town Center is a +/- 67.66 acre, 456,000 square foot retail facility anchored by Boscov's, Albi, Buy Buy Baby, Planet Fitness, Joann Fabrics, Bed Bath & Beyond and Old Navy. The center includes a Bertucci's Restaurant, Famous Dave's Barbeque, and Red Robin Restaurant." JX4, p.3.

("CTC").[9]  That parcel and the Property sit on West Main Street, which provides access to Route 273.[10]  West Main Street is a private road owned by Christiana Town Center, LLC, an affiliate of CTC, which "has not been completed"; once completed, it will join Eagle Run Road and Route 7 and become a public thoroughfare.[11]

### A. Historical ownership of the Property

The Property was owned by the late Jacob Goldstein who passed on October 3, 1979, and willed the Property to his five nieces and nephews (the "Family Owners").[12]  One of the Family Owners, Steven Goldstein ("Goldstein"), explained that the Property "was a long-term investment for all of [the Family Owners]."[13]  When he inherited the Property, "Interstate 95 was only a few years old at the time[,]" and "[t]here was talk about . . . Christiana Mall being built."[14]

But around 2000, Mr. Acierno filed an action in this Court contesting the Family Owners' interests and asserting a claim to the Property by way of adverse

---

[9] *See* Tr. 91:1-8.

[10] Tr. 12:8-21.

[11] Tr. 12:22-13:15. *See also* Tr. 96:7-16, 104:13-24.

[12] *See* Tr. 34:10-17; *In re Goldstein*, 74651 ("ROW"), D.I. 4, 6. *Arot v. Lardani*, 2018 WL 5430297, at *1 n.6 (Del. Ch. Oct. 29, 2018) (citing 12 *Del. C.* § 2501; Del. R. Evid. 202(d)(1)(C)) ("Because the Register of Wills is a Clerk of the Court of Chancery, filings with the Register of Wills are subject to judicial notice."). *But see* Tr. 34:24 (Goldstein) (testifying that his uncle died in 1970).

[13] Tr. 35:12-16.

[14] Tr. 35:16-20.

4

possession.[15]  The Family Owners counterclaimed for "trespass to land, to chattels,

and to timber, and for conversion, ejectment, a mandatory injunction compelling

Acierno to return the property to its original condition and a declaratory judgment

quieting title."[16]  Mr. Acierno's attempt to dismiss the counterclaims, for judgment

on the pleadings, and for summary judgment failed and the matter was set for trial.[17]

But "[a] few weeks before trial," Mr. Acierno "moved to dismiss his claim for

adverse possession."[18]  Vice Chancellor Parsons granted the motion and pushed

forward with trial on October 28 and 29, 2004, to determine:

> (1) whether [the Family Owners] [we]re entitled to attorneys' fees under the bad faith exception to the American Rule for having to defend against [Mr.] Acierno's adverse possession claim; (2) what, if any, damages [the Family Owners] [we]re entitled to for [Mr.] Acierno's trespass to timber on the [Property]; (3) whether [the Family Owners] [we]re entitled to either (a) a declaratory judgment restoring access to

---

[15] Tr. 38:3-5. *See generally Acierno v. Goldstein*, 2004 WL 1488673, at *1. This was not the first time the Property was addressed in this Court; as recognized by Vice Chancellor Parsons, one of the Family Owners filed a partition action on April 8, 1998. *Id.* at *2.  The outcome of such action is unclear.  Mr. Goldstein also testified that Mr. Acierno contacted some of the Family Owners "[s]everal years before" his lawsuit "to acquire the [P]roperty. And when he was rejected that's when he started his adverse possession claim." Tr. 39:12-17.

At trial, CTC objected to the relevance of the 2005 action and Mr. Acierno's connection to the Property or CTC. Tr. 20:13-21:11. I overruled the objection and find this background helpful in understanding the composition of the Property, the access easement, and the parties' respective interests. My holding, however, is not otherwise swayed or informed by the 2005 action or Mr. Acierno's involvement.

[16] *Acierno v. Goldstein*, 2004 WL 1488673, at *1.

[17] *See generally id.*; *Acierno v. Goldstein*, 2005 WL 3111993, at *1 (Del. Ch. Nov. 16, 2005).

[18] *Acierno v. Goldstein*, 2005 WL 3111993, at *1. *See also* Tr. 38:3-19.

[the Property] or (b) an easement by necessity over [Mr.] Acierno's land because [the Property was] landlocked; and (4) whether [Mr.] Acierno [was] entitled to attorneys' fees under the bad faith exception to the American Rule for having to defend against [the Family Owners'] counterclaims.[19]

After careful analysis, Vice Chancellor Parsons answered those questions as follows: (1) yes, in part (25%), because of misrepresentations Mr. Acierno made in his complaint and discovery responses,[20] (2) none, because the claims were time-barred and the Family Owners failed to prove damages;[21] (3) no to restoration but yes to an easement over "the proposed relief route connector" (now known as West Main Street);[22] and (4) no. Altogether, Vice Chancellor Parsons quieted title in favor of the Family Owners, ordered Mr. Acierno to vacate the Property, and enjoined future trespasses.[23]

At the time of Vice Chancellor Parsons' decision, the Family Owners consisted of Ronald Goldstein, Steven Goldstein, Karen Lipsy, Barbara Goldstein, and Lawrence Goldstein, each with equal 20% shares.[24] After that case concluded, on July 12, 2013, Barbara Goldstein passed intestate, leaving her 20% share to

---

[19] *Acierno v. Goldstein*, 2005 WL 3111993, at *2.

[20] *Id.* at *3-*4.

[21] *Id.* at *4-*7.

[22] *Id.* at *11-*12.

[23] *Id.* at *13.

[24] *Id.* at *1.

Lawrence Goldstein (bringing his interest to 40%).[25] Then on September 22, 2017, Lawrence Goldstein and Ronald Goldstein sold their shares (40% and 20%, respectively) to CTC.[26]

CTC is a Delaware limited liability company affiliated with Mr. Acierno.[27] James Oeste, the Vice President of Real Estate for CTC testified that the Acierno family was involved in the decision making to purchase an interest in the Property.[28] Mr. Oeste further explained that CTC owns or is affiliated with the owners of the parcels surrounding the Property.[29] Mr. Oeste explained CTC "want[s] to continue [its] development through the rest of [its] property[,]" and, thus, purchased a 60% interest in the Property "to finish the project."[30]

---

[25] *See* D.I. 3, ¶ 8.

[26] D.I. 50, III. ¶ 14.

[27] D.I. 50, III. ¶ 1; Tr. 20:9-10.

[28] Tr. 22:12-19.

[29] JX3, p.8. Mr. Oeste explained he is also Vice President of Real Estate for Allied Properties, an affiliate of CTC, and identified some other affiliates as Christiana Town Center, LLC and Christiana Fashion Center. Tr. 5:19-22, 11:2-8.

[30] Tr. 11:9-19. Mr. Oeste testified that only 60% was available for sale. Tr. 11:20-23. Goldstein, however, appears to disagree. He testified that there were only two times when inquiries were made to purchase his share of the Property: "Several years before Mr. Acierno asserted his adverse possession, he contacted [the Family Owners]" and "starting about ten years ago, [Goldstein] got phone calls from a real estate agent in Wilmington representing CTC to purchase the [P]roperty." Tr. 39:9-21. Goldstein explained that both times the Family Owners "weren't ready to sell" but "were still willing to take offers if they wanted to make any." Tr. 39:22-40:4. But since then, including during this litigation, Goldstein testified that CTC has not offered to buy his or the Trust's shares. Tr. 46:22-47:12.

7

With the 2017 conveyance, CTC acquired and has since enjoyed a 60% share of the Property.[31] Later, on January 3, 2020, Karen Lipsy passed and willed her interest in the Property to the Karen G. Lipsy Revocable Trust U/A/D November 11, 2019 (the "Trust", together with Goldstein, the "Respondents").[32] Thus, the remaining 40% is held in equal shares by Goldstein and the Trust.[33] Such is how the Property presented in this action—with CTC, the 60% owner, seeking partition of the Property in kind, to separate its joint interests with Goldstein and the Trust. The Trust does not oppose the request; Goldstein contends partition in kind would be detrimental to the co-owners' interests and the Property should be sold at auction

---

[31] D.I. 50, III. ¶ 14.

[32] D.I. 50, III. ¶ 4-5.

[33] D.I. 50, III. ¶ 5-6. Although the record is not abundantly clear, there appears to be a dispute regarding the Trust's interest in the Property. Per Goldstein, "it's been claimed that [he has] a right" to buy the Trust's interest in the Property arising from "the trust documents of [his sister]," but he has not seen the trust documents to confirm. Tr. 47:19-23. Goldstein explained that he learned of his potential interest "six, seven months after" his sister passed. Tr. 73:19-23. But his "brother-in-law, the trustee, has refused to show [him] the trust document, which purportedly gives [him] rights under [the Trust]." Tr. 74:15-18. Although still unclear, Goldstein is trying to exercise his rights to purchase the Trust's share. Tr. 47:24-48:2. He filed a lawsuit in Maryland to keep the trustee of the Trust "from selling [the Property] to anyone else before [Goldstein] can exercise whatever rights [he has] under [the Trust.]" Tr. 48:22-49:7. Goldstein makes reference to a "TRO, which [he] obtained from the Maryland court[,]" but otherwise it is unclear to me where this matter currently stands. Tr. 49:6-7.

8

instead.[34]  Specifically, Goldstein is concerned that the partitioned parcels would not be as valuable as the Property as a whole.[35]

## B.  Posture

CTC filed its petition for partition on November 14, 2019, which was amended on June 10, 2020 to reflect the Trust's inherited interest.[36]  The Respondents answered, and Goldstein counterclaimed for unjust enrichment on July 24, 2020 (the "Counterclaim").[37]  On March 29, 2021, I issued an order dismissing the Counterclaim finding Goldstein failed to plead a reasonably conceivable claim for unjust enrichment.[38]  No exceptions were filed.

---

[34] Goldstein explained that he is "not a developer[,]" and wants "to have the [P]roperty sold to a developer for the most value that [the Respondents] can get for it."  Tr. 44:2-6.  *See also* Tr. 50:11-16 ("I'm a lawyer. I don't develop real estate, commercial shopping centers.").  But Goldstein testified that "there's only one potential purchaser" of the Property: CTC. Tr. 35:8-11, 44:22-45:7 No one other than CTC has ever offered to purchase the Property from Goldstein. Tr. 40:5-8.

[35] Goldstein was not forthcoming with the entire basis for his objection.  In response to an interrogatory asking him whether he objected to a partition in-kind, he answered: "[Goldstein] does object to the Property being portioned in kind. [Goldstein] has concerns that if the Property were to be portioned, the portion of the Property that [Goldstein] would receive would be unable to be developed and would be rendered essentially valueless." *See* Tr. 51:23-52:12; JX1, p.8-9. He confirmed his answer at his deposition. *See* Tr. 54:16-55:6, 56:19-58:4. *But see* Tr: 77:1-7 (quoting and referencing deposition testimony that Goldstein gave explaining his interrogatory responses did not include details from documents submitted thereafter). But at trial he testified that he "wouldn't say that's the only reason. That's kind of a narrow—a narrow reason. You can make it a lot broader answer." Tr. 51:2-8.  Yet Goldstein never did provide his "broader answer" during trial.

[36] D.I. 1, 3.

[37] D.I. 4.

[38] D.I. 22.

9

On September 23, 2021, I issued a scheduling order for this matter to be heard starting March 1, 2022.[39] The two-day trial concluded on March 2, 2022, and post-trial briefing was completed on June 16, 2022, at which time the matter was submitted for my consideration.[40] This is my final report.

---

[39] D.I. 31.

[40] D.I. 62. At trial, the parties presented three (3) expert witnesses: Dev Sitaram, Ted C. Williams, and John J. Coyle. *See also* JX3-6 (expert reports). Each expert was well qualified and impressive.

Mr. Sitaram has "a bachelor's in civil engineering and a master's in civil engineering as well as a master's in business administration." Tr. 81:2-4. He is a registered professional engineer in Delaware, Pennsylvania, and Maryland, and the president and principal of Karins and Associates. Tr. 81:14-16, 82:6-12. Mr. Sitaram has "been in land development and land use matters pretty much from the start of [his] career." Tr. 83:5-7. He and his company specialize in land development and subdivision engineering. Tr. 83:8-9. In that capacity, he has worked on various projects including retail, commercial, residential, and industrial. Tr. 83:19-23. He has worked on "between ten and a hundred" restaurant-related projects and is "very familiar with the land development process and the New Castle County Code, which regulates the development of land in New Castle County." Tr. 84:2-5, 12-15. He is also familiar with "regulations of the State of Delaware for land development." Tr. 84:16-19. Mr. Sitaram also has experience in this Court. He was appointed by Vice Chancellor Laster to serve as an expert witness in *Zdeb v. Walker*, C.A. No. 2018-0604-JTL, an in-kind partition action. Tr. 86:7-12. *See also Zdeb v. Walker*, 2020 WL 7185640, at *2 (Del. Ch. Dec. 4, 2020) (ordering partition in kind in accordance with Mr. Sitaram's plan); *Zdeb v. Walker*, 2021 WL 979534, at *1 (Del. Ch. Mar. 12, 2021) (adopting metes and bounds descriptions prepared by Mr. Sitaram).

Mr. Williams has "a bachelor of science degree from Drexel University in civil engineering." Tr. 142:17-18. He is a registered engineer in Delaware and Maryland and has been "working in the engineering field since 1977." Tr. 143:4-10. He is currently the president and chairman of Landmark Science and Engineering. Tr. 143:11-16. In his career, he has been involved in a number of commercial center developments that included pad site restaurants. Tr. 147:20-24. And, in 2020, he was awarded the honor of engineer of the year by the Delaware Engineering Society. Tr. 144:10-14.

Mr. Coyle has a "bachelor of science degree in business administration from St. Joseph's University of Philadelphia, Pennsylvania[,]" and "a master of science degree in real estate and urban development planning from the American University in Washington, D.C." Tr. 168:16-21. He "grew up in the real estate business[,]" is a licensed real estate

10

## II.   ANALYSIS

Despite the long, contentious history of the Property, the question presented here is narrow: is partition in kind "detrimental to the interests of the parties" under 25 *Del. C.* § 729, such that the Property should be partitioned by sale?  I find the partition in kind is not detrimental to the parties' interests and CTC's proposed partition is fair and equitable.  Thus, I recommend judgment be entered in favor of CTC, and the Property partitioned as proposed by CTC.

### A.   Goldstein has failed to overcome the statutory presumption in favor of partition in kind.

 "The Delaware partition statute recognizes the common law equitable right to sever concurrent ownership interests in the same real property."[41]  Because of the unique nature of real property, "the Delaware statute continues the common law preference for a physical, in kind, division of the real property that makes 'a just and

---

broker and "certified general real estate appraiser" in Pennsylvania, Delaware, New Jersey, New York, Colorado, and Texas. Tr. 169:8-18.   Currently, he is the president and owner of Coyle, Lynch & Company, an appraisal business, and the co-owner of the Henderson Group, a real estate development group. Tr. 173:14-21.  His appraisal company has an office in Media, Pennsylvania, but he and his staff often work in New Castle County, Delaware. Tr. 171:5-18. They value various types of properties ranging from small tracts of land, to single-family dwellings, office buildings, shopping centers, and refinery-related assets. Tr. 171:20-172:10.

[41] *Peters v. Robinson*, 636 A.2d 926, 929 (Del. 1994). *See also Kuck v. Cropper*, 1978 WL 22465, at *3 (Del. Ch. Dec. 5, 1978) ("It is [a] well-established principle that the right of partition between cotenants is an *absolute* right.") (emphasis in original). "This absolute right, however, is subject to some limitations." *Id.*

11

fair partition thereof amongst the parties.'"[42] Thus, under 25 *Del. C.* § 729, partition by sale may only be granted "if it is shown otherwise to the Court that partition of the premises will be detrimental to the interests of the parties entitled[.]"[43] The party seeking a sale, rather than in-kind division, (here, Goldstein) bears the burden of proving such detriment.[44]

Partition may be detrimental where, for example, "the co-owners would lose a substantial portion of their current market value if the property were divided in kind" or "the small size and nature of the property makes it physically impracticable to divide that property into portions."[45]

These principles were demonstrated in *In re Real Estate of Jamies's LLC*, 2006 WL 644473, at *4 (Del. Ch. Mar. 1, 2006). There, an expert witness testified "that the highest-value use of the [p]roperty [was] as commercial property and that the [p]roperty [was] too small to be subdivided into two commercial parcels. Thus, the [expert] explained the aggregate value of the [p]roperty subdivided [was] less than the value as a single unit."[46] Relying on this unchallenged testimony, the master

---

[42] *Peters*, 636 A.2d at 929 (citations omitted).

[43] 25 *Del. C.* § 729.

[44] *In re Wapniarek*, 1986 WL 9611, at *3 (Del. Ch. Sept. 2, 1986) (citations omitted).

[45] *Chase v. Chase*, 2021 WL 3930443, at *5 (Del. Ch. Aug. 30, 2021), *adopted* (Del. Ch. 2021) (citations omitted).

[46] *In re Real Est. of Jamies's LLC*, 2006 WL 644473, at *3.

held and then-Vice Chancellor Strine affirmed "that a partition in kind would fail to achieve an equitable division and would harm the parties entitled to the [p]roperty by failing to maximize the value of the [p]roperty."[47]   Thus, the property was partitioned by sale.[48]

Similarly in *In re Wapniarek*, 1986 WL 9611, at *3 (Del. Ch. Sept. 2, 1986), then-Vice Chancellor Berger found "that partition in kind would be detrimental to the interests of the cotenants[,]" where "[t]he parcels [we]re irregular in shape, [we]re not contiguous and [we]re not susceptible to a six way division that would provide each cotenant with his or her fractional share of the parcels' value. Moreover, if the parcels were partitioned, they would lose a substantial portion of their current market value."[49]  In making this holding, then-Vice Chancellor Berger relied on unrebutted expert testimony that the property as a whole would be more valuable than as subdivided, and that the highest and best use would be rezoning and developing the property as a whole.[50]

---

[47] *Id.* at *4.

[48] *Id.*

[49] *Wapniarek*, 1986 WL 9611, at *3.

[50] *Id. See also Wingate v. Walker*, 2004 WL 74474, at *2 (Del. Ch. Jan. 12, 2004) (ordering partition by sale because "the two small residential lots in question cannot be partitioned physically into ten pieces with independent value, in the aggregate, equal to the value of the lots").

Goldstein cites a case from the Supreme Court of Georgia, *Chaney v. Upchurch*, 278 Ga. 515 (Ga. 2004), in support of a partition by sale.  In some ways, *Chaney* is comparable.  The 101.7-acre property at issue passed through intestacy to several family

I find *Jamies's LLC* and *Wapniarek* distinguishable. Unlike the parties seeking a sale in *Jamies's LLC* or *Wapniarek*, Goldstein has not presented affirmative evidence supporting a finding that the aggregate value of the Property subdivided is less than the value as a single unit. Such was Goldstein's burden and he failed to adduce evidence to meet it. Goldstein's only expert witness, Ted C. Williams, is not an expert in appraising real estate and did not offer any opinion regarding the value of the Property, as a whole or based on the proposed partition.[51]

member owners, some of whose interests were acquired over time by a non-family member. *Id.* at 515. Ultimately, the non-family member acquired 43% and sought partition of the tract of land. *Id.* But unlike here, the non-family member owner wanted partition by sale and the family members wanted, instead, an in-kind division. *Id.* Complicating the matter was that the property was zone agricultural, which required, in part, each parcel to be "at least five acres in size with a minimum of 50 feet of frontage on a public road[.]" *Id.* An expert surveyor concluded that an in-kind division would not be approved by the county because it would result in lots that were too small and had inadequate frontage. *Id.* The trial court accepted this as unchallenged expert opinion and found that "division in kind would result in fractional owners with devalued property" making an in-kind partition less "just and equitable." *Id.* The Supreme Court of Georgia affirmed that trial court ruling and ordered that the property be sold. *Id.* Unlike *Chaney*, however, there are no such bars to developing the Property; as discussed herein, Mr. Sitaram presented potential development plans, which have not been rebutted, and Goldstein has failed to present any affirmative evidence that the Property as partitioned would be less valuable than as a whole.

[51] Tr. 155:12-24. *See also* Tr. 61:10-13. Yet, Goldstein testified that he based his objections to the proposed partition on Mr. Williams' expert report. Tr. 65:3-66:9. Mr. Williams also prepared a concept plan for the Property as whole. *See* Tr. 152:24-153:10; JX10-11. Mr. Williams prepared one plan featuring a large retail space and another plan featuring two separate pad site restaurants. JX10 (featuring the large retail space); JX11 (featuring the two separate pad site restaurants). Mr. Williams confirmed, however, that he was not offering any expert testimony on how the Property could be developed; he was providing "[j]ust a review of a report prepared by Mr. Sitaram." Tr. 154:24-155:5.

CTC, conversely, presented persuasive testimony from their expert witness John J. Coyle.[52]  Like Mr. Williams, Mr. Coyle did not value the Property either as a whole or in subdivided parcels.[53]  Rather, he concluded "it would be better to look at what the dynamics are that would affect how such an estimate would be developed" and compare whether those dynamics would affect the Property differently as a whole or in 60/40 parts.[54]  Ultimately, Mr. Coyle concluded that the

---

[52] Goldstein belatedly sought to exclude Mr. Coyle's expert testimony through his post-trial brief. D.I. 60. Therein he argues "Mr. Coyle's report and testimony omit any valid reasoning or reliable methodology" and "Mr. Coyle's analysis not only is devoid of the data that one would need to test his conclusions, but his analysis is at odds with common sense as well." *Id.* at p.22. But this challenge is untimely.  Under my September 23, 2021 schedule, any motions *in limine* were due by January 14, 2022; no motion was filed to exclude Mr. Coyle's report or preclude his anticipated testimony. *See* D.I. 31.  Goldstein also had an opportunity to identify evidentiary issues in the pretrial order but failed to identify any concerns with Mr. Coyle's report or anticipated testimony. D.I. 46. And, finally, Goldstein failed to object at trial. Having remained silent at these three crucial moments, Goldstein cannot now challenge the admissibility of Mr. Coyle's expert opinions. *See Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 593 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010) (finding that defendant's challenge to expert testimony was not timely because it was not raised in the pretrial proceeding or the trial itself.). Goldstein's objections will, however, be addressed to the extent they go to weight rather than admissibility. *See Perry v. Berkley*, 996 A.2d 1262, 1271 (Del. 2010) ("We recognize that, as a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is for the opposing party to challenge the factual basis of the expert opinion on cross-examination.").

[53] *See* Tr. 176:19-177:3.

[54] *See* Tr. 177:7-18.

15

aggregate value and utility of the proposed subdivided parcels is the same as the value and utility of the Property as a whole.[55]

Goldstein takes issue with Mr. Coyle's opinions. Initially, Goldstein argues that Mr. Coyle's inability to appraise the Property in the traditional sense supports a forced sale. But in doing so, Goldstein attempts to shift his burden of proof to CTC. And the case he cites in support, *Pruitt v. Pruitt*, 298 S.C. 411 (S.C. 1989), is neither binding nor persuasive.[56]

Goldstein's strongest argument that partition in kind would be detrimental to the co-owners' interests is that the smaller proposed parcel would not be large enough for certain types of development, namely commercial lodging and heavy retail, which would arguably be permissible if the Property were not partitioned in

---

[55] Tr. 203:23-204:9. He did so after personally inspecting the Property and surrounding areas, reviewing the New Castle County Unified Development Code (the "UDC"), the New Castle County comprehensive plan, and Mr. Sitaram's plans, and then applying that information to the factors that drive the value of a property. Tr. 181:8-183:11, 186:16-23. Mr. Coyle looked at the factors of utility, scarcity, desire, and effective purchasing power and the principles of anticipation, change, supply and demand, substitution, balance, and externalities in reaching his conclusion. Tr. 186:16-188:15, 190:2-4, 8-14.

[56] In *Pruitt v. Pruitt*, the South Carolina Court of Appeals ordered partition by sale because there was "disparate testimony as to the value of the subject property[.]" 298 S.C. at 415. Here, only one person testified regarding valuation—Mr. Coyle. Goldstein may disagree with his expert opinions but has presented nothing in rebuttal. Goldstein also argues that Mr. Coyle failed to consider the additional benefit to CTC and adjoining property through the proposed partition. But I struggle to appreciate why such would be a relevant inquiry. The question is whether partition in kind would be detrimental to the co-owners of the Property vis-à-vis their interests in the Property.

kind.[57]  But even assuming these uses are available to the Property as a whole, Goldstein has failed to present evidence showing that the loss of such uses through partition is "detrimental" under Delaware law.

Rather, I find persuasive Mr. Coyle's testimony that such loss is not detrimental.  Based on his analysis, Mr. Coyle opined that "commercial use that's consistent with the balance of the CTC center" would be the highest and best use of the Property.[58]  Thus, Mr. Coyle testified there would be no diminution in value to the proposed 40% parcel in being unable to develop heavy retail and service or commercial lodging.[59]  In Mr. Coyle's opinion, "those uses are not truly the highest

---

[57] Tr.128:15-129:12. There appears to be some dispute about whether commercial lodging would be an available use for the Property as a whole. *See* Tr. 217:5-24. But I decline to address it as irrelevant to my ultimate findings and recommendation.

[58] Tr. 190:20-21. Mr. Coyle's analysis of highest and best use "consider[ed] alternative programs of utilization which are: [l]egally permissible, and in compliance with zoning and other land use controls, deed restrictions, or other similar constraints; [p]hysically possible, based on the adaptability and utility of the land and improvements proposed or actually in place; and [e]conomically feasible, and fulfilling an identifiable demand in the market." JX4, p.4.

[59] *See* Tr. 193:12-23, 195:12-22. Mr. Coyle testified "not having two acres, in my opinion, is not an impediment to the reasonableness of this distribution." Mr. Coyle found "to a reasonable degree of professional certainty within the field of real estate valuation and land development that the proposed partition of the [Property] does not diminish the pro rata share of either of the 60% interest or the 40% interest." JX4, p.7. Stated another way, per Mr. Coyle "the aggregate value and utility of the 1.477 acre site and the 2.173 acre site is the same as the value and utility of the 3.650 acre site as a single property." JX4, p.8.

and best use" of the Property and "those uses, in [his] opinion, could detract from the value of the entirety."[60]

Goldstein also appears to argue that equitable considerations weigh in favor of partition by sale. In support he quotes from *Zimmerman v. Marsh*, 365 S.C. 383 (S.C. 2005), a decision from the Supreme Court of South Carolina. There, the appellate court found that partition by sale was not warranted and that partition by allotment should have been granted instead.[61] In so holding, the court noted "[w]e find it troublesome that [one side] purchased their interest [in the property] with the knowledge that [their co-owner] would be unwilling to sell the property and with the apparent intention to seek an immediate partition of the property."[62] This note reflected one of the equitable considerations relevant to the court's decision whether, under a South Carolina statute, "partition in kind or by allotment [could] be fairly

---

[60] Tr. 194:17-20. Specifically, Mr. Coyle testified that heavy retail included a fuel dealer or automobile service center, which he believes may negatively affect the balance of the overall area. Tr. 210:7-211:15. *See also* Tr. 219:6-9 (Coyle) ("If you start leasing to some of these tenants that are listed under the heavy commercial, I think you're going to demean the quality of the center."). He also concluded that the Property would not be a "good site for a hotel" because it is too "far off the main highway" and there are twenty (20) hotels in a three-mile radius, plus "two additional proposed hotels for the area." Tr. 198:3-24. I find Goldstein's attempts to rebut Mr. Coyle's hotel conclusions through his post-trial brief unpersuasive. *See* D.I. 60, p.22-23.

[61] The dissenting justice in *Zimmerman* explained that partition by allotment means "to 'allot' a portion of the property to one of the owners, with the remainder held jointly by the other owners or sold with the proceeds divided among the owners." *Zimmerman*, 365 S.C. at 389 (citing *Few v. Few,* 242 S.C. 433, 440 (S.C. 1963); *Bennett v. Floyd,* 237 S.C. 64, 73 (S.C. 1960)).

[62] *Id.* at 387.

18

and impartially made . . . without injury to any of the parties in interest[.]"[63] Ultimately, the court found that partition by allotment was "the most equitable result[,]" and ordered on remand that the property be valued so that one side could buy out the other.[64]  In doing so, the dissenting justice in *Zimmerman* characterizes the court as effectively ordering "a private rather than a public sale" of the property.[65]

*Zimmerman* is distinguishable in numerous ways.  First, unlike the South Carolina statute, Delaware's statutory scheme for partitions does not expressly permit, let alone prioritize, partition by allotment.[66]  Second, the court used the equitable considerations of the new co-owners' motivations to allow a co-owner to retain the property. Here, Goldstein seeks to avoid the statutory presumption in Delaware of an in-kind distribution and force a sale (the opposite result).  Third, and

---

[63] S.C. CODE ANN. § 15-61-50.

[64] *Zimmerman*, 365 S.C. at 388.

[65] *Id.* at 390.

[66] It appears, rather, that partition by allotment is not an available remedy in Delaware because the statutory scheme contemplates only two options: first, a preference for in-kind distribution and second, if the first would be detrimental, a sale at "public vendue." 25 *Del. C.* § 729. *But see In re 3818 Eunice Ave., Wilm., Del., 19808 Tax Parcel No. 08-038.40-360*, 2022 WL 3696806, at *1 (Del. Ch. Jan. 27, 2022) ("the partition statute does not, however, exclude the equitable remedy of owelty"); *E. C. D. v. R. D. T.*, 2019 WL 7370411, at *3 (Del. Fam. Apr. 15, 2019) (finding case "to be among those rare cases where it is appropriate to dispense with the requirement of sale of the property" and ordering one co-owner to quitclaim their interest to the other).

finally, Goldstein has not pled an equitable exception to statutory partition that might render equitable considerations relevant.[67]

Goldstein objected to in-kind partition and, as such, bore the burden of proving partition in kind would be detrimental to the co-owners' interests. He failed to meet that burden. As such, under Delaware law, the Property should be partitioned in kind to separate CTC's 60% share.

**B.      CTC's proposed partition in kind should be adopted as a just and fair partition.**

Under 25 *Del. C.* § 724, a decree for partition in kind shall state the shares to be allotted to each co-owner, respectively. "The Court may then direct that a commission be issued, directed to 3 freeholders of the county to be appointed in the decree as commissioners, authorizing and directing them, after being duly sworn or affirmed, according to the best of their skill and judgment, to go upon the premises and make a just and fair partition thereof amongst the parties in the proportions mentioned in the commission."[68]   This Court has recognized, however, that

---

[67] *See Oldham v. Taylor*, 2003 WL 21786217, at *6 (Del. Ch. Aug. 4, 2003) (acknowledging the availability of equitable defenses but noting none had been raised). *Cf. Chalfant v. Cornett*, 1996 WL 162262, at *4 (Del. Ch. Mar. 25, 1996) (concluding "that there are times when a court of equity will exercise its equitable powers to deny a request to partition real estate").

[68] 25 *Del. C.* § 724.

appointment of a commission is not mandatory.[69]  For example, in *Zdeb v. Walker*, C.A. No. 2018-0604-JTL, Vice Chancellor Laster declined to appoint a commission in favor of a panel of experts.[70]

I likewise recommend that a commission not be appointed.  Initially, neither side has advocated for the appointment of a commission.  Rather, CTC seeks approval of its proposed partition, and Goldstein seeks, instead, a partition by sale.[71]  Thus, the parties have effectively waived any argument for the appointment of a commission.[72]  And I find the appointment of a commission at this stage, after a full trial on the merits which included expert testimony on an equitable division of the Property, would serve only to delay.[73]

Rather, I find CTC's proposed partition should be adopted.  I review CTC's proposal as I would review one from a commission—to determine if it is just and

---

[69] *See, e.g.*, *Peters v. Robinson*, 636 A.2d at 929 (noting that the co-owners waived the appointment of a commission).

[70] *Zdeb v. Walker*, C.A. No. 2018-0604-JTL, D.I. 20. *See also* 25 *Del. C.* § 751. *But see In re Real Est. of Roth*, 1987 WL 9370, at *2 (Del. Ch. Mar. 16, 1987) ("I do not see the statutory authority to dispense with commissioners, in the absence of agreement by all interested parties.").

[71] *But see* D.I. 3, p.6.

[72] *See Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief.").

[73] *See Zdeb v. Walker*, C.A. No. 2018-0604-JTL, D.I. 15 (discussing the time and expense involved in the commission process).

fair.[74] In my review I must consider not only whether the division matches the co-owners' respective interests but also the unique attributes of the subdivided parcels and the "equitable principles of fairness in approving an assignment of a particular parcel" to co-owners.[75]

Then-Master Glasscock demonstrated such review in *Lynch v. Thompson*, 2009 WL 707637, at *1 (Del. Ch. Mar. 5, 2009). In *Lynch*, the commission recommend in-kind partition through a 50/50 split of the property, creating an eastern parcel and a western parcel.[76] Although "equal in size and physical attributes," the court recognized "the western parcel [would] have a special attribute-the eligibility for annexation into the City of Milford-that the eastern parcel [would] not."[77] The party to whom the commission allocated the eastern parcel contested the allocation.[78]

Then-Master Glasscock assumed the annexation eligibility added "some value" or advantage to the western parcel.[79] But he found that advantage was illusory because annexation could be denied and if annexation were granted, the

---

[74] *See Lynch v. Thompson*, 2009 WL 707637, at *1 (Del. Ch. Mar. 5, 2009).

[75] *Roth*, 1987 WL 9370, at *1.

[76] *Lynch*, 2009 WL 707637, at *1.

[77] *Id.*

[78] *Id.*

[79] *Id.* at *2.

eastern parcel would then be eligible for annexation as "contiguous with the City of Milford."[80]  This assumed, however, that the party allocated the western parcel would pursue annexation in good faith.  To ensure a fair and just partition, thus, then-Master Glasscock approved the allocation with two strings: (1) that the parties retaining the western parcel be required to "seek at their sole expense, and make a good faith effort to obtain, annexation of the western parcel within 12 months from the date of partition, to insure that the attribute of amenability to annexation (assuming it exists) shall be available" to all parties and (2) that the deed to the western parcel include a provision "indicating that the owners thereof, and their successors and assigns, shall not oppose annexation of the [other] parcel."[81]

---

[80] *Id.*

[81] *Id.*

Here, CTC's expert witness Dev Sitaram has prepared and presented a proposed partition as reflected below in Figure B, showing the Respondents' proposed 40% share as the shaded area in the middle.



*Figure B, JX3, p.9.*

Mr. Sitaram explained that CTC directed him to prepare a 60/40 partition in-kind proposal.[82] In doing so, his "goal was to assure that the 40 percent that was partitioned on behalf of the [R]espondents was going to be fully utilized or fully

---

[82] Tr. 87:19-20. Mr. Sitaram was not asked to propose a partition of 60-20-20. *Id. See also* Tr. 26:7-14 (Oeste) (explaining that he did not know of "any consideration of attempting to partition 60/20/20). Mr. Sitaram confirmed that he has been working with CTC since "the early 2000s" in developing CTC's adjacent parcel. Tr. 124:7-18.

developable."[83]  Thus, he determined to include any undevelopable portions of the Property in the 60% portion for CTC.[84]  With these goals in mind, Mr. Sitaram prepared the proposed partition of the Property in Figure B, which would allocate to the Respondents 40.48% of the Property and the remaining 59.52% to CTC.[85]  The areas of the Property that are not developable are entirely on CTC's proposed parcel.[86]  The completion of West Main Street would also be within CTC's proposed parcel.[87]  Conversely, the 40.48% of the Property allocated to the Respondents would be fully developable.[88]

Here there can be no dispute that CTC's proposed partition fairly reflects the parties' respective ownership interest. Goldstein appears to fault the proposed partition for reflecting a split of 60/40 rather than 60/20/20, arguing that the relationship between the Respondents is dysfunctional and a partition that retains

---

[83] Tr. 87:23-88:1.

[84] Tr. 88:1-4.

[85] JX3.  Mr. Oeste testified that under CTC's proposed partition West Main Street would be completed and provide "additional traffic capacity between [Route] 273 and Route 7." Tr. 15:15-24. Completing the road, per Mr. Oeste, is what DelDOT expects from CTC as part of the overall development of the area; DelDOT "still desire[s] it to be finished in order to assist with the reduction of traffic in the Village of Christiana itself." Tr. 16:7-11.

[86] Tr. 88:18-23.  The undevelopable areas include wetlands, which Mr. Oeste explained would require West Main Street to include a crossover bridge. Tr. 17:6-8.

[87] Tr. 91:12-20.  *See also* Tr. 17:9-13, 18:11-13.

[88] *See* Tr. 18:17-19. Mr. Sitaram contends that taking into account the undevelopable portions of CTC's proposed share, the partition is closer to 50/50.  Tr. 108:6-15.  Per Mr. Sitaram, the Respondents would have 1.5 acres of fully developable land; CTC would only have 1.48. *Id.*

25

their joint ownership would be inequitable. In support, Goldstein cites a decision by the Supreme Court of North Dakota, *Schmidt v. Wittinger*, 687 N.W.2d 479 (N.D. 2004). There, the co-owned property was active farmland and a partition in kind would require coordination of fencing among co-owners with a history of hostility toward each other.[89] The subdivided parcels would also have unequal access to water supply, and disparate burdens imposed by a meandering river.[90] Thus, the trial court held, and the appellate court affirmed, that in-kind partition would work great prejudice and, as such, North Dakota law required a partition by sale.[91]

    *Schmidt* is distinguishable. The Property does not have similar limitations and, rather, the portion to be allocated to the Respondents is fully developable. Second, the Respondents had the chance to propose a 60/20/20 split and failed to do so. They cannot foist that failure onto CTC who prosecuted this action for the purpose of removing their 60% share.[92] And, as recognized in *Chase v. Chase*, "[a]lthough partition is often seen as presenting a binary choice—in kind or by

---

[89] *Schmidt v. Wittinger*, 687 N.W.2d at 482.

[90] *Id.*

[91] *Id.* at 484.

[92] D.I. 3-4. Goldstein's answer does not include a counterclaim seeking partition of the remaining 40% of the Property. D.I. 4. *Cf. Real Est. of 299 Assocs., LLC v. Rutkoske*, 2000 WL 1805388, at *2 (Del. Ch. Nov. 9, 2000) (finding that a one-sixth owner was entitled to partition and holding that "absent an application to supplement the record to demonstrate that a partition of [the property] into two pieces (one of one-sixth and one of five-sixths of the total value) would be detrimental to the interest of the parties, a partition in kind shall take place").

sale—the statute 'does contemplate a partition in kind and a sale in the same partition action.'"[93] Thus, if the Respondents seek to separate their 40% interests, something that has not been requested thus far, and they agree or demonstrate that in-kind division would be detrimental to their interests, a partition by sale may be available.[94]

Further, I find CTC's proposed partition is otherwise just and fair. Goldstein's primary concern about the proposed partition relates to the Respondents' ability to develop the remaining parcel. But Mr. Sitaram included two potential development plans for the Respondents' parcel, one featuring a 10,000 square foot retail space and another featuring a 6,300 square foot restaurant.[95] Goldstein's expert witness, Mr. Williams agrees that Mr. Sitaram's plans are technically feasible and meet the requirements under the UDC.[96] And I find Mr. Williams' attempts to cast doubt on

---

[93] *Chase v. Chase*, 2021 WL 3930443, at *5 (quoting *Roth*, 1987 WL 9370, at *1).

[94] *See Chase*, 2021 WL 3930443, at *5-*6.

[95] JX3, p.9-10. Mr. Sitaram explained that he prepared these "to show that the [R]espondents could develop the [P]roperty independent of what is going on around them, and that they could . . . make full use of the land once it's partitioned the way [he is] recommending it be partitioned." Tr. 94:4-10. He further testified that his two proposals are not the only options for the Respondents. Tr. 94:11-16. Mr. Coyle identified other types of facilities that could be developed including "brank banks, opticians, shoe stores, other kinds of personal service shops—a beauty shop or something like that". Tr. 221:22-222:9. And Mr. Oeste affirmed that CTC does not "have an opinion on what the [R]espondents plan to do with [their] 40 percent[.]" Tr. 31:17-19.

[96] Tr. 146:14-24. JX5. Mr. Coyle agreed with Mr. Sitaram, "to a reasonable degree of professional certainty within the field of real estate valuation and land development, that the proposed partitioning of the 3.650 acre site into a 1.477 acre site and a 2.173 acre site represents an equitable division of the [P]roperty among the 40% interest and 60% interest therein." JX4, p.8.

the proposals were largely driven by personal preferences and other factors irrelevant to whether the partition is just and fair.[97]

---

[97] In Mr. Williams' report, he identified seven points of response to Mr. Sitaram's report. JX5. But Mr. Williams only testified to five (5): (1) the size of the restaurant, (2) the amount of parking, (3) the traffic flow, (4) the unusual angles of the subdivided parcel, and (5) stormwater management. Tr. 147:12-152:10.

Regarding (1) and (2), Mr. Williams testified that "the projects [his company has] been involved in, a typical dinner house type restaurant," which appears to be proposed by Mr. Sitaram, "would be closer to 7,000 square feet." Tr. 147:16-19. Mr. Williams further explained that Mr. Sitaram's plan provides more parking than required under the UDC but his company has "found that restaurant users are demanding quite a bit more parking for their uses, versus what the UDC requires or what is shown on" Mr. Sitaram's plan. Tr. 148:4-12. Mr. Sitaram testified that, in his opinion, "the restaurants are getting smaller." Tr. 117:15-19. Out of thirteen restaurant projects in his company's files, "there were only four that were in the 7,000 or anywhere close to the 7,000 square foot range. Most of them are below the 6300 square feet" that Mr. Sitaram used in his plan. Tr. 117:23-118:3.

Regarding (3) Mr. Williams explained: "retailers are looking for a volume of traffic along the frontage of the property before they'll sign leases. And based upon [Mr. Sitaram's plan], it does not appear there would be sufficient traffic going along the front of the property." Tr. 149:7-17. But Mr. Williams acknowledged that "[t]he only reason [he] thought traffic would be minimal for the proposed retail store is because [West Main Street] had not been built yet[.]" Tr. 160:7-10. He still contends there needs to be "reasonable traffic" but "without doing a traffic analysis to determine what the volume of traffic would be on that road, you can't provide an answer on is that volume sufficient for a typical retailer." Tr. 150:3-11. Mr. Sitaram responds that West Main Street "will have significant high volumes because . . . it is considered the Christiana bypass. So it's a bypass around the Village of Christiana, and the intent is to connect Route 273 and the retail developments that are on the westerly side of Route 273[.]" Tr. 115:19-116:1.

Regarding (4), Mr. Williams testified that the parcels have "some unusual angles . . . that limit how development can occur." Tr. 151:2-3. Mr. Sitaram testified "[t]here is nothing that prohibits the shape of the parcel or the size of the parcel", "[i]t is a fair partition and a fair land development", and the 40% parcel "is self-sufficient, [and] reasonably can be developed the way" he has presented. Tr. 122:1-8. Mr. Coyle also rejected the idea that the shape of the proposed subdivided parcels would diminish their value. He explained "non-rectangularly shaped parcels are a very, very common element in commercial real estate[,]" and "provided the shape of the parcel does not diminish the potential density of development of the parcel, the irregular configuration of the parcel is not an issue." Tr. 200:13-20.

28

Also unpersuasive is Goldstein's argument that the proposed partition is inequitable because it also benefits the surrounding properties, which are owned by CTC or its affiliates. The premise is correct—Mr. Sitaram admitted that the proposed partition would also benefit CTC's affiliates and other properties.[98] For example, the proposed partition would permit CTC to expand West Main Street for the benefit of the Christiana Town Center, Christiana Fashion Center, and Christiana Mall.[99] But Goldstein has failed to demonstrate how and why such shared benefit renders the requested partition unjust or unfair to the co-owners of the Property vis-à-vis their interests in the Property.

Goldstein also argues that because CTC does not "need to immediately build" the rest of West Main Street, "the promise that the proposed [40%] parcel would have the benefit of frontage along a road that connects to the Christiana Mall is

---

Regarding (5), Mr. Williams identified that the plans did not appear to have surface-type stormwater management and that underground storage "would add additional cost to the development." Tr. 151:14-152:10. Mr. Sitaram did not disagree but explained "it is a matter of economics whether portions of the stormwater management facility are underground or above-ground. It's all directly dependent on how much of the [Respondents'] property they desire to be developed and the intensity of development that they desire within . . . the 1.48 acres." Tr. 114:11-17.

[98] Tr. 115:17-116:14. Mr. Oeste agreed that the proposed partition would benefit the other properties owned by CTC and its affiliates. Tr. 26:15-18.

[99] Tr. 131:5-20. *See also* Tr. 27:2-12. Mr. Oeste agreed that CTC "would not be able to develop the expansion of the Christiana Town Center" as contemplated without its interest in the Property. Tr. 30:10-16.

29

highly speculative".[100] I disagree. Mr. Oeste testified that the Delaware Department of Transportation ("DelDOT") "still desire[s the road] to be finished in order to assist with the reduction of traffic in the Village of Christiana itself."[101] Mr. Sitaram agreed that DelDOT would require the road to be built when the Property was developed, regardless of the outcome of this partition action.[102] Thus, the future construction of West Main Street, over which the Respondents already maintain an easement,[103] is not speculative such that the proposed partition is unjust or unfair.

Under the proposed partition, Goldstein and the Trust would retain slightly more than their 40% interest in the Property, all of which could be developed. CTC would bear the loss of the areas that are not developable, as well as the area that would be lost to complete West Main Street. With these losses, CTC is arguably allocated less than its fair share. Goldstein and the Trust, on the other hand, will be allocated a parcel with no environmental limitations, which is fully developable. As such, I find that the proposed partition is an equitable division of the Property.

---

[100] D.I. 60 p.24.

[101] Tr. 16:7-11.

[102] Tr. 134:14-22.

[103] *Acierno v. Goldstein*, 2005 WL 3111993, at *12.

30

## C.    Conclusion

For the foregoing reasons, I find that the Property should be partitioned in kind as proposed by CTC.  Goldstein failed to meet his burden to prove partition in kind would be detrimental to the parties' interests and I find CTC's proposed partition is just and fair and should be adopted.

This is my final report and exceptions may be filed under Court of Chancery Rule 144.

Respectfully submitted,

/s/ *Selena E. Molina*

Master in Chancery